Harold Brans, J.
This is an application by the defendant to set aside a verdict returned by a jury 17 years ago. On April 11, 1956, the defendant, charged with a killing during the commission of an armed robbery, was found guilty of murder in the first degree as a felony murder, by a jury in the Court of General Sessions, without a recommendation of life imprisonment.[1] In the absence of such recommendation, the sentence then mandated by law was death (former Penal Law, § 1045).
Upon receipt of the verdict, one of the defense counsel moved that the defendant be committed for observation, in the following language:
“MR. SUAREZ: In view of the nature of the verdict in this ease, and in view of the nature of the relationship of the defendant with counsel for the defense and the experience that Your Honor had —
“ MR. WAS SER: And that counsel had.
“ MR. SUAREZ: — and that we had with the defendant, may I respectfully ask that the defendant be committed to Bellevue for observation prior to his day of sentence.
“ THE COURT: Has he not been in Bellevue?
“MR. SUAREZ: But that was over a year ago, Your Honor.
“ THE COURT: All right, I will grant your application.”
On April 27, 1956, following an examination of the defendant, a report was rendered to the presiding judge by two qualified psychiatrists of Bellevue Hospital, John H. Cassity, M.D. and Theodore S. Weiss, M.D. That report contained the psychiatrists’ ‘ ‘ impression that due to the prolonged incarcerations, that this man has developed a definite reactive psychotic state commonly known as Acute Stress Reaction. Consequently, we feel, at this time that he is a suitable case for commitment to one of the state mental hospital [sic]. We anticipate that there will be a complete recovery from this acute stress reaction. We are therefore awaiting your order for a Formal Hearing.” The report concluded: ‘[1] He is in such a state of insanity as to be *212 incapable of understanding the charge, indictment, proceedings, or of making his defense. In summary, this patient is suffering from a reactive psychotic state commonly known as Acute Stress Reaction.”
On June 5, 1956, said Drs. Cassity and Weiss, following a hearing at Bellevue Hospital required, by law, sent their formal report to the presiding judge.[2] At that hearing, the mother and the sister of the defendant and the defendant were present and testified.
In their formal report Drs. Cassity and Weiss reaffirmed their conclusions and diagnosis contained in the report of April 27 and stated:" During the hearing, the defendant displays similar attitude to that which he exhibited during our interviews with him prior to the hearing. He was very suspicious, he would glance about at his attorneys with menacing glares. He continued to be unco-operative with them during the hearing, this despite the fact that he had been apprized by them of his conviction before a jury. He was extremely evasiving [sic] regarding the crime and repeated time and time again that he wanted to die. He continued this kind of behaviour throughout the hearing.
" As to our conclusions in this case we are still of the opinion that he is a sociopathie personality and subject to psychotic episodes. This particular one, we believe, was due to prolonged incarceration and hence was regarded as an acute stress reaction from which he has not yet recovered. Though the statements made by his mother and sister during the hearing to the effect that he was subject to delusions .of persecution since childhood, we were not at all convinced that he is suffering from Schizophrenia. We base this upon the fact that the defendant failed to mention any of these earlier psychotic experiences.” (Italics added.)[3]
Following the receipt of the said formal report, the defendant was committed to and transferred to Matteawan State Hospital *213 for the Criminally Insane. He was incarcerated for more than 16 years under treatment. He has never been sentenced.[4]
On two occasions during the past two years, defendant was returned by the Matteawan authorities as competent and fit to proceed and moved, for the first time, to set aside the said verdict, contending (1) that he was not competent during his trial and (2) that he possessed newly discovered evidence of his innocence (GPL 330.30). After a required hearing (People v. Aponte, 28 N Y 2d 343), the defendant was found to be a “ dangerous incapacitated person ” (GPL art. 730) and recommitted to Matteawan (see previous decisions of this court dated Oct. 17, 1972, and May 30, 1973, respectively).
In this present proceeding, counsel for the defendant and the District Attorney have accepted and not controverted the recent findings of this court’s psychiatrists, dated July 18, 1973, that the. defendant is competent and fit to proceed. Under the circumstances this court has now undertaken to resolve finally the Issues raised by defendant’s motions.
At the outset it is observed that no evidence of value has been offered to sustain defendant’s contention of “ newly discovered evidence.” Therefore, that part of defendant’s motion is denied.
This court will now address itself to the defendant’s claim that he was incompetent during his trial in 1956.
In this connection, the defendant contends that all the available evidence establishes that he was mentally incompetent during his trial, that his mental illness predated the verdict in the case and the commencement of the trial, and was not the result of the jury’s declaration of his guilt.
The District Attorney contends that the defendant was sane during the trial, that the diagnosis of Bellevue Hospital following his examination there on April 27, 1956, of ‘ ‘ reactive psychotic state commonly known as Acute Stress Reaction ’ ’ resulted from the nature of the verdict, and therefore there is nothing to show that the defendant was incompetent during the trial, particularly since he had been examined mentally in March of 1955 and found to be sane then.
In Pate v. Robinson (383 U. S. 375), a defendant convicted of murder in 1959 and sentenced to life imprisonment had sought *214 "unsuccessfully at his trial to raise the issue of his competency to stand trial despite a lengthy psychiatric history. The Supreme Court held (p. 377): “We have concluded that Robinson was constitutionally entitled to a hearing on the issue of his competence to stand trial”. The court further noted (p. 385): “ Where the evidence raises a ‘ bona fide doubt ’ as to a defendant’s competence to stand trial, the judge on his own motion must * * * conduct a sanity hearing ’ ’.
In commenting upon the time when such a hearing should be held, the court in Pate made the following observations (p. 377): “we do not think there could be a meaningful hearing on that issue at this late date ”. “ We have previously emphasized the difficulty of retrospectively determining an accused’s competence to stand trial. Bushy v. United States, 362 U. S. 402 (1960) * * *' [there is] * * * need for concurrent determination ” (p. 387).
It is noted that the Supreme Court ruling in Pate occurred six years after the trial. In the case at bar the question as to the defendant’s mental competence to stand trial is before this court 17 years after the rendition of the verdict.
We now come to the question of whether the court should apply the rule of Pate (supra) so as to set aside the verdict without a hearing or whether, in order to decide the defendant’s application, a hearing should have been held to determine the defendant’s mental capacity during trial.
In People v. Hudson (19 N Y 2d 137, 140), our Court of Appeals stated that: ‘ ‘ The availability of medical proof related to conditions at the initiation and during the progress of the trial, and of the close observations of witnesses who, from different points of vantage, observed defendant and could describe his conduct, makes it possible to afford a plenary inquiry into his competency at the time of trial. The issue would not here be left, as it was in Pate, to opinions based on reading a printed record. All of the safeguards of a concurrent determination would thus be preserved.”
In People v. Gonzalez (20 N Y 2d 289, 293), the Court of Appeals confirmed its view in Hudson (supra) stating: “In People v. Hudson (19 N Y 2d 137) we interpreted the rule laid down by Patey. Robinson (supra). In Pate the Supreme Court held that a new trial was mandated since ' expert witnesses would have to testify solely from information contained in the printed record. That Robinson’s hearing would be held six years after the fact aggravates these difficulties. ’ (Pate v. Robinson, supra, p. 387.) The court in Pate found that it would *215 be virtually impossible to determine Robinson’s sanity at the time of trial solely from the printed record. We distinguished Hudson from Pate in this respect on the ground that there was available in Hudson ‘ medical proof related to conditions at the initiation and during the progress of the trial, and of the close observations of witnesses who, from different points of vantage, observed defendant and could describe his conduct, [which] makes it possible to afford a plenary inquiry into his competency at the time of trial. The issue would not here be left, as it was in Pate, to opinions based on reading a printed record. All the safeguards of a concurrent determination would thus be preserved. ’ (People v. Hudson, supra, p. 140.) ”
Our Appellate Division has hesitated to apply the Pate rule when witnesses are available to testify to the defendant’s mental capacity at the time of trial. (People v. Mullooly, 37 A D 2d 6.)
This court made inquiry to determine whether witnesses were available for a hearing on the issue involved, to wit, the defendant’s mental capacity at time of trial. Unfortunately, the following persons were not available by reason of death: Louis Wasser, one of the defense team, Judge Jonah J. Goldstein, the Judge of the Court of General Sessions who presided at the trial, Dr. John H. Cassity and Dr. Theodore S. Weiss, both of whom had rendered their psychiatric report of the defendant to Judge Goldstein. However, the following witnesses were available to testify at such hearing: two of the three defense counsel who represented the defendant at the trial, i. e. Harold Frankel and Oscar Gonzalez Suarez, the defendant’s mother, Mrs. Maria Freyre, and the Assistant District Attorney who prosecuted the indictment, William P. Loguen, now a Judge of the Criminal Court. Also available were two expert psychiatric witnesses, Laurence A. Kaplan, M. D. and John B. Train, M. D., for the defendant and prosecution respectively.
Accordingly, this court undertook, despite the passage of 17 years, to conduct a hearing which commenced on August 7, 1973, continued on August 8,10,13,14,17, 20, 23, 30, September 11 and concluded on September 17, 1973.
Mr. Frankel recalled very little of the trial and of his relationship with the defendant except that the defendant spoke Spanish and was able to communicate only with Mr. Suarez.
Mr. Suarez’s recollection was more detailed. He recalled feeling at the time of the defendant’s trial that the defendant suffered from a mental disorder, and that he moved in 1955 to have the defendant committed for a mental examination. However, the defendant was returned to court as competent and fit *216 to proceed.[5] Mr. Suarez’s opinion that there was something wrong with the defendant never left him during the trial. He testified to off-the-record conferences at the bench with the Trial Judge, at which he asked for a further inquiry into the defendant’s mental state. He recalled outbursts by the defendant in the courtroom, some of which he maintained were not reflected in the trial record stenographic minutes — outbursts at which the defendant hurled epithets at the Judge. On one occasion the Judge threatened to gag the defendant. He recalled, too, that when he sought to discuss certain aspects of the trial with the defendant, the defendant was either not responsive or was indifferent. On one visit to the Tombs, he feared the defendant would use force against him. During the trial he asked to he relieved and to withdraw from the case; that the defendant considered his lawyers to be members of the District Attorney’s staff. Mr. Suarez recalled that when the verdict was received he made the motion to commit the defendant to Bellevue Hospital prior to sentence.[6]
The defendant’s mother gave testimony concerning various illnesses and a fall the defendant experienced during his childhood, and then about his later years. She recalled that the *217 defendant had repeatedly expressed dissatisfaction with Mr. Suarez because Suarez believed the witnesses against the defendant and not the defendant himself. Apparently the defendant’s mother had no difficulty in communicating with the defendant during the trial, although counsel protested the defendant’s inability to discuss the case ‘ ‘ intelligently. ’ ’
Dr. L. I. Kaplan, a qualified psychiatrist, testified for the defense, based upon his review of the defendant’s psychiatric history at Bellevue and Matteawan.[7] He offered his opinion that the defendant at the time of trial [1] ‘ was suffering from a psychiatric disorder which made it impossible for him to adequately co-operate with his attorneys in his defense and to understand thoroughly the nature of the defense necessary in such a problem, ’ ’ and that the defendant had always suffered from [1] ‘ paranoid schizophrenic reaction.” Dr. Kaplan rejected the suggestion that his diagnosis was inconsistent with that of the Bellevue psychiatrists, dated June 5, 1956, explaining that he had the benefit of a more complete psychiatric history than that available in June of 1956.
Dr. Train, another qualified psychiatrist, differed from the conclusion of Dr. Kaplan. It was his opinion that the defendant during the 1956 trial was not “ suffering from such a state of idiocy, imbecility or insanity as to be incapable of understanding the nature of the charge, indictment or proceedings against him or of making his defense.” He had found that the defendant’s background was “ not that of a pre-psycho tic personality that develops schizophrenia ’ ’; that there was no evidence of psychosis in the defendant’s history and that he was not incompetent until the verdict was returned in court. According to Dr. Train, the defendant, unable to contend with the verdict, [1] ‘ developed an acute stress reaction of withdrawal, depression and denial of reality and from that point on his mental decomposition was rapid and his mental operations reflected * * * poorly organized paranoid delusional symptoms resembling ,a schizophrenic ”.
*218 The defendant insisted on taking the stand, expressing the nature of his delusions, which he asserted that he had in 1956 — that he believed a group of persons, unidentified, was attempting to have him convicted of a crime he never committed. It is not necessary to detail the delusions that the defendant had. Suffice to state that at one time he claimed to be the son of G-od and that his behavior on earth was being controlled by radio waves.
The defendant chose not to call the then Assistant District Attorney (now Judge) Loguen to testify, as it was agreed between the parties that he had no information relevant to the inquiry.
On September 11, 1973 in the latter stages of this hearing, the defendant handed to the court, for the court’s “ private ” reading, a four-page letter. The court has read this letter and must state that the contents of the letter gave pertinent information which opened to question the diagnosis by Dr. Cassity of the defendant at Bellevue in 1956. This information also supported the defendant’s assertion that his mental illness was not merely a reaction to the jury’s verdict but in fact was mental illness which could be traced to his childhood.[8]
*220 If this motion were to be resolved solely on the basis of testimony adduced at this hearing as required by Hudson (supra) and Gonzales (supra), the one definite finding which could be made is that the defendant was found to be incompetent on June 5, 1956. The Bellevue psychiatrists stated then that the defendant“ is in such a state of insanity that he is incapable of understanding the charge, indictment or proceedings or of making his defense * * * that he is a suitable case for
commitment to a mental hospital ’ ’ and that he could not be returned to court for further legal proceedings.
The inference to be drawn from this state of fact is that this mental condition existed prior to its determination by the Bellevue psychiatrists.
“There are many instances where the law permits an inference as to a prior condition from proof of a subsequent *221 one.” Tims, in a proper case, proof of insanity at a subsequent time will allow an inference that the insanity existed at a prior time (Richardson, Evidence [9th eel., Prince], § 73).
In People v. Hill (9 A D 2d 451, 454, affd. 8 N Y 2d 935) the observation was made: “ Proof that a defendant was insane at a certain time has a bearing on whether he was insane at a prior time, at least if the times are not remote in relation to each other (People v. Esposito, 287 N. Y. 389, 396; People v. Draper, 278 App. Div. 298, 303-304, affd. 303 N. Y. 653).” (See, also, Fisch, Evidence, § 208.) The case at bar obviously is such a case.
Under the rule enunciated in prior eases, the burden is upon the People to prove the defendant’s competence to stand trial (People v. Swallow, 60 Misc 2d 171; People v. Mullooly, 37 A D 2d 6, supra). The court finds that in the totality of the evidence adduced at the hearing, the prosecution has not sustained that burden.
Having received a formal report on June 5, 1956 as to the defendant’s mental incapacity and having been alerted during the trial to the defendant’s mental condition or at least to the defendant’s erratic behavior, and having had witnesses available, the court should then have ordered, sua sponte, a hearing to determine the defendant’s mental capacity during trial (former Code Crim. Pro., § 658). It did not do so.
The failure of the court to make a ££ concurrent determination ” as to the defendant’s mental state during trial deprived the defendant of due process of law (Pate v. Robinson, supra).
Accordingly, the defendant’s motion to set aside the verdict of the jury on April 11,1956 is granted.[9]

. The Trial Judge submitted the following possible verdicts to the jury for its consideration: (1) guilty of murder in the first degree as a felony murder, without a recommendation; (2) guilty of murder in the first degree as a felony murder, with a recommendation that the defendant be imprisoned for the term of his natural life; (3) guilty of murder in the first degree by premeditated and deliberate design; (4) guilty of murder in the second degree; (5) guilty of manslaughter in the first degree, or (6) not guilty.

. Sections 658 through 662 of the Code of Criminal Procedure provided for such examination and hearing. These sections by title provided for “ Inquiry into the insanity of defendant, before or during the trial, or after conviction.”

. The following definitions will prove helpful:
Schizophrenia — any of a group of psychotic disorders characterized by delusional formations, a retreat from reality, conflicting emotions and deterioration of the personality; formerly called dementia praecox.
Psychosis — a mental disorder, severe in character, often involving disorganization of the total personality, with or without organic disease.
Psychotic — one suffering from a psychosis.

. The death sentence could not be imposed today.
The Court of Appeals in People v. Fitzpatrick (32 N Y 2d 499, 510 [following the ruling of the United States 'Supreme Court in Furman v. Georgia, 408 U. S. 238] ) held the death penalty constituted “ cruel and unusual punishment ” and thus unconstitutional under the Eighth Amendment. Apparently under such circumstances, a life sentence must be imposed.

. On March 7, 1955 Drs. Cassity and Weiss, qualified psychiatrists of Bellevue Hospital, after reviewing all the available data found that the defendant was “ not in such a state of idiocy, imbecility or insanity as to be incapable of understanding the charge, indictment, proceedings and of making his defense * * there is no evidence of a psychosis or mental deficiency. The diagnosis is Soeiopathie Personality Disturbance.”

. The motion contained three parts: the first, “In view of the nature of the verdict in this case”; the second, “in view of the nature of the relationship of the defendant with counsel for the defense ”, and the third “ [in view of] the experience that Tour Honor had ® * * and that counsel had * * * and that we had with the defendant.” The motion warrants these comments:
With respect to the first phrase — “In view of the nature of the verdict in this case ” — it is conceivable that counsel prior to the verdict had discussed the defendant’s mental state with the Judge because the nature of the verdict warranted electrocution. This would be entirely consistent with Mr. Suarez’s recollection that the defendant’s mental capacity was indeed discussed with the presiding Judge off the record.
The second phrase — “in view of the nature of the relationship of the defendant with cotinsel for the defense ” — is borne out to some degree by the stenographic minutes to which reference was made earlier and Mr. Suarez’s present recollection of the difficulties he experienced with the defendant.
And the third phrase ■ — ■ “ [in view of] the experience that Tour Honor had * * * and that counsel had " ” and that we had with the defendant.” — although without any basis in the trial record, supports Mr. Suarez’s testimony about the use of epithets by the defendant and the possibility expressed by the Judge that the defendant might have to be gagged.

. The defendant’s history at Matteawan reflects continued mental deterioration for the first few years of his incarceration. In a summary dated August 3, 1956 iwe find the following diagnosis: “ It is the opinion of the staff that the present mental picture appeared to be in the nature of a prison psychosis and was reactive in nature. Accordingly the diagnosis of Psychosis with Psychopathic Personality Reactive Features, is accepted.”
On September 13, 1961: “ This patient continues to show symptoms of Schizophrenia with confusion and delusional ideas. Therefore, the diagnosis is being changed to Schizophrenia, mixed type.”

. The defendant on September 11, 1973 had handed to the court a four-page letter which he asked that his counsel should not read.
In his letter defendant stated that his ease was reported in the book entitled “ The Quality of Murder” authored by John Holland Cassity, M. D., that it would prove he suffered from mental illness since the age of five and that at that time he had “ childhood schizophrenia”. Dr. Cassity was one of the qualified psychiatrists who examined the defendant after his commitment to Bellevue in April, 1956. This book was published by The Julian Press, Inc., Hew York, 1958. Through the courtesy of the Hew York Academy of Medicine, a copy of the book was obtained. Indeed, it contains a discussion by Dr. Cassity of the mental history of the defendant herein. Under the chapter heading “ Portent of crime in childhood ”, the pertinent pages of Dr. Cassity’s book follow: “A trail along which police said they questioned at least 100 women, picking up a clue here, another there and finally piecing them all together, led Monday to the arrest of an ex-convict charged with a Chinatown hold-up murder on August 5. Journal-American, 10/19/54 ”.
“ The third ease in this series is an example of childhood schizophrenia. The validity of such a diagnosis, incidentally, is questioned in some psychiatric circles.
“ But I am in accord with Dr. Bender in her conviction that schizophrenia is an organic and therefore a fundamental process, rather than a functional one resulting from environmental conditioning. It is the problem of the psychiatrist to detect the presence of the disorder in its ineipiency, that is, in the formative years of life. The principal obstacle in the diagnosis is the difficulty of obtaining accurate historical background. Relatives are usually unable to recall incidents which have meaning for the physician in his later examination. Like many of my colleagues, I fall occasionally into the practice of loosely labeling all individuals with immoral or antisocial tendencies as sociopaths. *219 Time and again, Dr. Benjamin Karpman, of St. Elizabeth’s Hospital at various psychiatric meetings and conventions, has emphasized that this procedure is not only untenable, but fallacious. He stresses the fact that most of the people whom we describe as sociopaths are fundamentally psychoneurotics, eyclothymics (persons subject to alternating waves of depression and elation) and, most frequently, schizophrenics.
“ In the case that follows, it was the pertinent information, supplied by relatives, dating back to the defendant’s early childhood, that enabled me to make a more accurate diagnosis.
“ Radames Freyre, a 29-year-old Puerto Rican, arrived in the United States in 1945. By 1947, he was jailed on an assault charge and sent to the penal institution at Woodbourne. Later, he was transferred to Dannemora, which houses prisoners who have developed mental illnesses while in confinement. He was released from jail in 1952. After that, he worked at odd jobs in restaurants.
“ On the police blotter, a crime of murder was recorded as of August 1954. How Fu Lien, age 30, had been fatally shot in his home during the commission of a stick-up. His roommate, Ching Vun Gee, had been pistol-whipped by Freyre and his accomplice. The attackers had fled, without taking the $400 that was in the apartment, when Lien, mortally wounded, crawled to the door, opened it, and shouted for help. Gee identified Freyre as the killer. Neighbors, shoppers, and clerks in the downstairs stores supplied further information.
“Freyre was found sleeping in an auto in Harlem and taken into custody in October, 1954. At that time, he made, both to the arresting officer and to the District Attorney, categorical denials of any knowledge of the crime.
“But the police supplied items of information that were unmistakable. So did the dead man’s roommate. Freyre was convicted by a jury on a charge of murder in the first degree.
“ During the trial, denial was his sole defense. He berated his counsel for having advised him to accept a lesser plea. He accused the lawyer of collusion with the District Attorney.
“The attitude of the defendant was noted by the Judge who also took into consideration, apparently, his flat refusal to accept a plea of murder in the second degree which would have spared him electrocution. The court ordered a psychiatric evaluation.
“In psychiatric contacts, Freyre revealed himself as seclusive and retarded. He responded to all questions hesitatingly. He was, at all times, suspicious and mistrustful.
“As early as the age of 9, he admitted, he had the impression that he was being trailed by 'dead people.’ He had complained then that 'people were always bothering me.’ When asked in what respect, he said, ' They try to influence my mind.’ When asked if that sort of thing was going on here, too, he replied, ' That is right.’
“ He went on to state his belief in being able to read other peoples’ minds. He complained to the nurses that his food and cigarettes were being poisoned. At one time, he expressed the idea that his attorney, Mr. Suarez, had ' planted a fellow ’ in the ward to watch him. He held steadfastly to his claim that he had not been convicted and continued to repeat, 'I was just charged by the jury.’ When asked his preference regarding Matteawan versus death, he answered, 'To die is better.’ He asked to 'go free’ as though nothing had happened.
“My diagnostic impression at this point was quite definitely that of childhood schizophrenia. I went next to interview the mother. Her statement follows: ' When he was 6 or 7, often, instead of going to school, he’d go to the *220 river. He wouldn’t come home for lunch or supper. He didn’t want to sleep in the house. He used to go under the house. Sometimes he went downstairs looking for people he said wanted to kill him, (Friends?) Not many. He had a dog and used to sleep with him under the house and I’d go out looking for him. He was always upset. Imagined people were against him. I think this was imaginary. While in the U. S. he still talked the same way. Here, he says there’s a war going on outside the hospital. (What did he say about the crime?) He said Mr. Suarez is not his lawyer; that he is a District Attorney and that what happened to him wasn’t a trial. He said the lawyer Suarez charged the jury. (Why not take him to a doctor in childhood?) We tried to persuade him to go but he wouldn’t. He told me he wanted to kill himself. (Before the crime?) Yes, and even before he went to prison the first time. He always told me that.’
“A sister who was present at the interview corroborated the statements of the mother and, in addition, reported that he fought with his brothers for no reason and never seemed to care what happened to him or to anyone else.
“ ‘ He just wasn’t interested in anything. Here, he told me Suarez is persecuting him and that it wasn’t a trial. He said, “ there’s a hypnotist here in Bellevue that tells me things.” He warned me not to talk to anybody. He said there was a war outside * * * and to go and take care of mother. Then he left me. I called him back, but he wouldn’t come.’
“The statements of the mother and sister served conclusively to substantiate my original impression. The patient is still in Matteawan. ¡Sad his condition been merely a reactive psychotic state, he would undoubtedly have recovered long before the end of his three-year residence at that institution. In my opinion, this is certainly a case where childhood schizophrenia served as the underlying cause of the crime of murder.” (Italics added.)
Dr. Cassity’s statement that the defendant’s mental state can be traced to childhood schizophrenia is at variance with his observations of June 5, 1956 that there was no evidence of schizophrenia. It is to be noted that the book was published in 1958, about two years following Dr. Cassity’s examination of the defendant. In the passage of time apparently Dr. Cassity expanded and refined his views of the defendant’s mental state. Had Dr. Cassity been available at this hearing to testify, it would have been illuminating if he were asked to reconcile his findings in 1958 with his findings in 1956.

. In a memorandum submitted by the District Attorney after the conclusion of the hearing, the District Attorney contends that “ no later than September 17, 1973, it was the court’s obligation to have the defendant examined by a psychiatrist to determine the defendant’s competency to proceed with this latest hearing.” The District Attorney claims that “on that date the defendant’s demeanor was that of an extremely disturbed person ” and accordingly the defendant’s motion should be held in abeyance until it is determined that he is capable of participating in these proceedings or in the alternative the defendant’s motion should in all respects be denied. (People v. Aponte, 28 N Y 2d 343, supra.)
The court does not agree with the District Attorney’s contention. Subdivision 5 of CPL 730.60 which became effective on September 1, 1971, post-Aponte, provides as follows: “ When a defendant is in the custody of the commissioner [of Mental Hygiene] pursuant to an order of commitment or an order of retention he may make any motion authorized by this chapter which is susceptible of fair determination without his personal participation.”
Even assuming (and there may be some substance to the District Attorney’s claim that on September 17, 1973 the defendant’s demeanor was that of a disturbed person), the hearing had by then progressed to the point which *222 enables the court to make a fair determination of the defendant’s motion. The court finds that throughout the entire hearing, the defendant had meaningfully participated and assisted his counsel therein and that his participation on September 17, 1973 was no longer essential.
Accordingly the court finds that Aponte (supra) is not a bar to the court’s determination of the motion. To hold otherwise would be to postpone indefinitely a decision on the merits thereof, which we are now attempting to meet 17 years after the trial.